The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

TONDA FERRANDO and DEX MARZANO, individually and on behalf of all others similarly situated,

     *Plaintiffs,*

v.

ZYNGA INC., a Delaware corporation,

     *Defendant.*

Case No. 22-cv-214-RSL

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT**

Noting Date: December 1, 2022

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 2

    I.      Class Counsel's 2015 Social Casino Lawsuits ................................. 3

    II.     Class Counsel Appeals the *Kater* Dismissal, and the Ninth
              Circuit Reverses ............................................................................ 4

    III.    Class Counsel's Litigation of This and Similar Cases Before
              the Court ....................................................................................... 5

    IV.    Class Counsel's Leadership of Multi-District Litigation Regarding Social
              Casinos ........................................................................................ 7

    V.      Class Counsel's Litigation-Adjacent Efforts on Behalf of the Class ..................... 7

    VI.    The Settlement Now Before the Court ......................................... 11

THE TERMS OF THE SETTLEMENT AGREEMENT ................................. 11

    A.     Settlement Class Definition ......................................................... 11

    B.     Monetary Benefits ...................................................................... 11

    C.     Prospective Relief ....................................................................... 12

    D.     Release ........................................................................................ 13

    E.     Attorney's Fees, Expenses Requests & Incentive Award Requests ..................... 13

ARGUMENT .................................................................................................... 13

    I.      The Court Need Not Revisit Class Certification ......................... 13

    II.     Notice Satisfied Due Process ..................................................... 13

    III.    The Court Should Finally Approve the Settlement ...................... 15

              A.  Class Counsel and the Class Representatives have adequately represented
                   the Class and support the Settlement ................................... 16

**B.  The Settlement was negotiated at arm's length and shows no signs of collusion** .................................................................................................... 18

**C.  The amount offered in the Settlement is adequate, given the strength of Plaintiffs' case and the risks inherent in further litigation** ............................ 19

    **i.  The Settlement Class would have faced significant delay before it could have recovered anything on the merits** ........................................ 19

    **ii.  Given the risks involved with further litigation, the amount offered in Settlement is outstanding** .................................................................. 21

**D.  The Settlement treats Settlement Class Members equitably** .......................... 23

**E.  Class Counsel was able to reach an informed judgment about the benefits of settling and the quality of the Settlement** ........................................................ 24

**F.  The reaction of the Settlement Class has been favorable** ............................... 25

**CONCLUSION** ............................................................................................................. 26

**Edelson PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974) ............................................................................................... 13

**United States Circuit Court of Appeals Cases**

*Churchill Vill., L.L.C. v. Gen. Elec.,*
    361 F.3d 566 (9th Cir. 2004) ....................................................................... 16, 26

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ............................................................................ 13

*In re Apple Inc. Device Performance Litig.,*
    50 F.4th 769 (9th Cir. 2022) ............................................................................... 16

*In re Bluetooth Headset Prods. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) ....................................................................... 16, 18

*In re Equity Funding Corp. of Am. Securities Litig.,*
    603 F.2d 1353 (9th Cir. 1979) ........................................................................... 23

*Juris v. Inamed Corp.,*
    685 F.3d 1294 (11th Cir. 2012) ......................................................................... 13

*Kater v. Churchill Downs,*
    886 F.3d 784 (9th Cir. 2018) ......................................................................... 4, 20

*Mason v. Mach. Zone, Inc.,*
    851 F.3d 315 (4th Cir. 2017) ............................................................................... 3

*Mullins v Direct Digital LLC,*
    795 F.3d 654 (7th Cir. 2015) ............................................................................. 13

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.,*
    688 F.2d 615 (9th Cir. 1982) ............................................................................. 21

*Rodriguez v. W. Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ............................................................................. 20

*Roes, 1-2 v. SFBSC Mgmt., LLC,*
    944 F.3d 1035 (9th Cir. 2019) ..................................................................... 16, 17

**United States District Court Cases**

*Aikens v. Panatte, LLC*,
    No. 2:17-cv-01519 (W.D. Wash. Feb. 5, 2019) ................................................ 13

*Askar v. Health Providers Choice, Inc.*,
    No. 19-CV-06125-BLF, 2021 WL 4846955 (N.D. Cal. Oct. 18, 2021) ........................... 15

*Bayat v. Bank of the West*,
    No. C-13-2376 EMC, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015).............................. 19

*Benson v. DoubleDown Interactive, LLC*,
    No. 18-cv-525 (W.D. Wash. June 17, 2020) .................................................. 20

*Dupee v. Playtika Santa Monica, et al.*,
    No. 15-cv-01021 (N.D. Ohio May 21, 2015) ..................................................... 3

*Dupee v. Playtika Santa Monica, et al.*,
    No. 15-cv-01021, 2016 WL 795857 (N.D. Ohio Mar. 1, 2016) .................................... 4

*Evans v. Zions Bancorporation, N.A.*,
    No. 2:17-CV-01123 WBS DB, 2022 WL 16815301 (E.D. Cal. Nov. 8, 2022).............. 17

*Ikuseghan v. Multicare Health Sys.*,
    No. 3:14-cv-05539 BHS, 2016 WL 3976569 (W.D. Wash. July 25, 2016)............... 20, 25

*In re Apple In-App Purchase Litigation*,
    No. 5:11-CV-01758 EJD, 2013 WL 1856713 (N.D. Cal. May 2, 2013) ......................... 22

*In Re: Daily Fantasy Sports Litigation*,
    No. 16-md-2677-GAO (D. Mass.) .............................................................. 2, 21

*Jackson v. King Cnty.*,
    No. 21-CV-00995-LK-BAT, 2022 WL 168524 (W.D. Wash. Jan. 18, 2022) ................ 18

*Kater v. Churchill Downs Inc.*,
    No. 15-cv-00612 (W.D. Wash. Apr. 17, 2015) ............................................... 3, 7

*Kater v. Churchill Downs Inc.*,
    No. 15-cv-00612, 2015 WL 9839755 (W.D. Wash. Nov. 19, 2015) ............................. 4

*Mason v. Mach. Zone, Inc.*,
    No. 15-cv-01107 (D. Md. Apr. 17, 2015) ......................................................... 3

*Mason v. Mach. Zone, Inc.*,
    140 F. Supp. 3d 457 (D. Md. 2015)............................................................... 3

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

*Pelletz v. Weyerhouser Corp.*,
      255 F.R.D. 537 (W.D. Wash. 2009).................................................................25

*Phillips v. Double Down Interactive LLC*,
      No. 15-cv-04301 (N.D. Ill. May 14, 2015) .......................................................3

*Phillips v. Double Down Interactive LLC*,
      173 F. Supp. 3d 731, 739 (N.D. Ill. 2016) .......................................................4

*Rinky Dink Inc. v. World Bus. Lenders, LLC*,
      No. C14-0268-JCC, 2016 WL 4052588 (W.D. Wash. Feb. 3, 2016) ..............24

*Ristic v. Mach. Zone, Inc.*,
      No. 15-cv-08996 (N.D. Ill. Oct. 9, 2015) ........................................................3

*Ristic v. Mach. Zone, Inc.*,
      No. 15-cv-08996, 2016 WL 4987943 (N.D. Ill. Sept. 19, 2016) ......................4

*Schneider v. Wilcox Farms, Inc.*,
      No. 07-CV-01160-JLR, 2009 WL 10726662 (W.D. Wash. Jan. 12, 2009).....................25

*Walters v. Target Corp.*,
      No. 3:16-cv-1678-L-MDD, 2020 WL 6277436 (S.D. Cal. Oct. 26, 2020)....................16

**State Court Cases**

*Zanca v. Epic Games*,
      No. 21-CVS-534 (Wake Cnty. Sup. Ct. Jan. 12, 2021)....................................22

**Miscellaneous Authority**

2 McLaughlin on Class Actions
      § 6.23 (17th ed. 2020)....................................................................................24

*Addicted to losing: How casino-like apps have drained people of millions*,
      NBC NEWS (Sept. 14, 2020), https://nbcnews.to/39Lo1X1 ............................10

Dean Takahashi, *13 predictions for the future of the $3.4B social casino games market*,
      GAMESBEAT (Oct. 19, 2015, 6:00 AM), https://bit.ly/37TPao9.........................2

Epic Games Settlement FAQs,
      EPIQ SYSTEMS INC. (May 11, 2022), https://bit.ly/3MC2LUb .........................22

Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain Language Guide*,
      https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf ..............................14

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

Fed. R. Civ. P. 23 ................................................................................................... 13, 23

*Harpooned by Facebook*, REVEAL-CENTER FOR INVESTIGATIVE REPORTING (Aug. 3, 2019),
    https://bit.ly/39NIdri .................................................................................... 10

H.B. 2041, 66th Leg., Reg Sess. (Wash. 2019) ................................................................ 8

H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020) ........................................................ 8, 20

*How social casinos leverage Facebook user data to target vulnerable gamblers*,
    PBS NEWSHOUR (Aug. 13, 2019), https://to.pbs.org/3lPRd1m ........................ 10

Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are
    considering a crackdown*,
    CROSSCUT (Feb. 7, 2020), https://bit.ly/3hfFxDl ........................................... 10

Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino
    From Legal Trouble*,
    CASINO.ORG (Jan. 29, 2020), https://bit.ly/39dKtWM ...................................... 8

S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019) ............................................................... 8

S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020) ............................................................... 8

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

**INTRODUCTION**

Plaintiffs filed this lawsuit in February 2022, alleging that Zynga's social casino apps constitute illegal gambling and unfair business practices under Washington law. Drawing on Class Counsel's eight years of litigation and advocacy on behalf of consumers losing money to social casino apps, including four prior class settlements before this Court, the Parties agreed to an early mediation of the case and, after a full-day in-person mediation assisted by Phillips ADR, agreed to a classwide settlement featuring a $12 million all-cash common fund. Based on the Settlement Administrator's final tally, that recovery reflects approximately 21% of the approximately $57 million in damages alleged by the Class.

The Court preliminarily approved the settlement on June 28, 2022 and ordered Class Counsel to proceed with the notice plan and claims process. The Court-approved notice plan and claims process have now been executed, and Class counsel are pleased to report not only that the notice plan successfully reached more than 90% of the Class with direct notice (in addition to publication notice efforts), but also that the reaction of the Class was—as with all four of Class Counsel's previous social casino settlements—overwhelmingly positive. Thousands of Class Members submitted claims associated with at least $14.45 million in losses, reflecting an Adjusted Claims Rate of at least 25.25%.[1] No Class Members objected to the settlement, and only a single Class Member requested exclusion.

Given the life-changing relief afforded under the settlement, this sort of reaction—though exceptional for consumer class actions—is unsurprising. As predicted in Class Counsel's preliminary approval papers, participating Class Members stand to recover substantial portions of their losses, with those who have lost the most standing to recover the majority of their losses. In light of the novelty of Plaintiffs' claims, Professor William B. Rubenstein has described these

---

[1]    *See* Declaration of Reed Baessler ("Baessler Decl.") ¶¶ 7, 23. The timely submitted claims are associated with at least $14.45 million in Lifetime Spending Amount. *See id.* ¶ 23. The total Lifetime Spending Amount of the Settlement Class is approximately $57 million. *See id.* ¶ 7. The Adjusted Claims Rate is calculated by dividing the former figure by the latter, equaling at least 25.25%.

recoveries as an "astounding accomplishment." Dkt. #51 ¶ 2. Despite the early settlement in this case, the relief obtained here matches the recoveries achieved in the four prior settlements in this District, and it far exceeds any other comparator settlements. *See, e.g.*, *In Re: Daily Fantasy Sports Litig.*, No. 16-md-2677-GAO, Dkt. #459 (D. Mass. Sep. 2, 2021) (settlement returning in-game currency and cash totaling $720,000 to consumers who alleged companies were engaged in illegal gambling and caused them to lose hundreds of millions of dollars).

For the reasons that follow, this Settlement is fair, reasonable, and adequate, and the Court should not hesitate to grant final approval.

## BACKGROUND[2]

In 2014, Class Counsel began investigating the burgeoning social casino industry. *See* Declaration of Todd Logan ("Logan Decl.") ¶ 3. The results of that investigation were startling: multinational gambling corporations and social video game developers had teamed up and found a way to smuggle slot machines onto consumers' smart phones without complying with any federal or state gambling laws. *See id.* ¶ 4. By 2015, social casino games were capturing more than $3 billion in annual revenues.[3] Those revenues, just like those of Vegas casinos, were disproportionately derived from gambling addicts who just couldn't stop themselves from buying chips and spinning the slots. Moreover, those revenues—at least in Class Counsel's judgment—were entirely ill-gotten gains under a variety of state gambling laws. *See id.*

Based on that investigation, in 2015 Class Counsel initiated a nationwide, multi-forum campaign against the social casino industry. *See id.* ¶ 5. As Professor William B. Rubenstein, the author of *Newberg on Class Actions*, summarizes that campaign (and its results):

> Prior to entering academia, I was a lawyer at the national office of the American Civil Liberties Union (ACLU) for nearly a decade, during which time I pursued civil rights campaigns on behalf of minority groups. Based on that experience, it strikes me that what Class Counsel have pursued here

---

[2]    The litigation background was previously detailed in Class Counsel's Motion For Award of Attorneys' Fees and Expenses and Issuance of Incentive Awards. *See* Dkt. #49. Plaintiffs repeat it here for the Court's convenience.

[3]    *See* Dean Takahashi, *13 predictions for the future of the $3.4B social casino games market*, GAMESBEAT (Oct. 19, 2015), https://bit.ly/2W83Yu3.

is closer in form to a civil rights litigation campaign than it is to a series of discrete class action settlements. Class Counsel saw an injustice – a thinly disguised form of gambling preying on those most vulnerable to addictive gambling – and they sought to fix it. Their goal was not to win a case but to reform an entire industry, much like a civil rights campaign might aim to reform a particular type of discriminatory practice across an entire employment sector. To accomplish this end, Class Counsel went far beyond what lawyers pursuing a simple class action case would normally do. Class Counsel pursued multiple cases. Class Counsel pursued multiple defendants. Class Counsel filed actions in multiple forums. Class Counsel tested various state laws. Class Counsel built websites to help app users avoid forced arbitration clauses, lobbied legislators and regulators, and took their efforts to the media. When Class Counsel lost, they did not give up, but changed tactics or forums and kept going. And they did all of this with their own funds, risking millions of dollars of their own money to end this practice. What they have achieved so far, with a series of five settlements, is an astounding accomplishment that begins to chip away at the pernicious underlying social casinos.

Dkt. #51 (Rubenstein Decl.) ¶ 2.

Because the extraordinary Settlement here is but a part of Class Counsel's efforts carrying the banner nationwide for victims of the social casino industry, a summary of Class Counsel's efforts both before this Court and otherwise is provided below.

## I.    Class Counsel's 2015 Social Casino Lawsuits.

Having concluded that social casinos constituted gambling, between April and October of 2015, Class Counsel filed five proposed class action lawsuits, in four different courts, alleging class claims under five different sets of state gambling laws. *See* **(1)** *Dupee v. Playtika Santa Monica*, No. 15-cv-01021 (N.D. Ohio May 21, 2015) (alleging claims under Ohio and Nevada gambling laws); **(2)** *Kater v. Churchill Downs Inc.*, No. 15-cv-612 (W.D. Wash. Apr. 17, 2015) (alleging claims under Washington gambling law); **(3)** *Mason v. Mach. Zone, Inc.*, No. 15-cv-01107 (D. Md. Apr. 17, 2015) (alleging claims under California and Illinois gambling laws) **(4)** *Phillips v. Double Down Interactive LLC*, No. 15-cv-04301 (N.D. Ill. May 14, 2015) (alleging claims under Illinois gambling laws); and **(5)** *Ristic v. Mach. Zone, Inc.*, No. 15-cv-08996 (N.D. Ill. Oct. 9, 2015) (alleging claims under Illinois gambling laws).

Each federal district court initially presented with Class Counsel's theory of these cases—*i.e.*, that social casinos are illegal gambling and consequently must return to consumers their ill-gotten gains—squarely rejected it. *See Mason v. Mach Zone, Inc.*, 140 F. Supp. 3d 457, 470 (D. Md. 2015), *aff'd*, 851 F.3d 315 (4th Cir. 2017); *Kater v. Churchill Downs Inc.*, No. 15-

cv-612 MJP, 2015 WL 9839755, at *3 (W.D. Wash. Nov. 19, 2015), *rev'd*, 886 F.3d 784 (9th Cir. 2018); *Dupee v. Playtika Santa Monica*, No. 15-cv-1201, 2016 WL 795857, at *1 (N.D. Ohio Mar. 1, 2016); *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 739 (N.D. Ill. 2016); *Ristic v. Mach. Zone, Inc.*, No. 15-cv-8996, 2016 WL 4987943, at *4 (N.D. Ill. Sept. 19, 2016). In representative fashion, Judge Pechman's dismissal order in *Kater* concluded that "Big Fish Casino does not award something of value satisfying the requisite prize element, and therefore the game is not 'illegal gambling' under Washington law." *Kater*, 2015 WL 9839755, at *4.

## II.    Class Counsel Appeals the *Kater* Dismissal, and the Ninth Circuit Reverses.

Following Judge Pechman's dismissal order in *Kater*, Class Counsel appealed. Merits briefing before the Ninth Circuit concluded in September 2016, and oral argument was held in February 2018. In March 2018, the Ninth Circuit reversed:

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant–Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

*Kater*, 886 F.3d at 785. In that opinion, the Ninth Circuit dispensed with a variety of the arguments that had persuaded district courts nationwide to initially dismiss the social casino cases. For example, the Court rejected the argument that social casino chips "do not extend gameplay, but only enhance it." *Id.* at 787. The Circuit also rejected Big Fish's argument that the Washington State Gambling Commission ("WSGC" or "Commission") had determined that social casino games aren't gambling, concluding that "these documents do not indicate that the Commission adopted a formal position on social gaming platforms." *Id.* at 788. And the Ninth Circuit explicitly rejected "the reasoning of other federal courts that have held that certain 'free to play' games are not illegal gambling." *Id.*

**III.    Class Counsel's Litigation of This and Similar Cases Before This Court.**

Soon after remand in *Kater*, Class Counsel filed five additional proposed class action lawsuits in this District: (1) *Wilson v. Playtika, Ltd.*, No. 18-cv-5277; (2) *Wilson v. Huuuge, Inc.*, No. 18-cv-5276; (3) *Reed v. Light & Wonder, Inc. (f/k/a Scientific Games Corp.*), No. 18-cv-565 ("*Scientific Games*"), (4) *Benson v. DoubleDown Interactive, LLC*, No. 18-cv-525; and (5) *Wilson v. PTT, LLC*, No. 18-cv-5275 ("*High 5*"). Each alleged that a major social casino company's online slot machines constitute unlawful gambling under Washington's gambling laws. *See* Dkt. #23 at 3.

Over the next four years, Class Counsel fended off a barrage of motions in each of these actions, including: motions to dismiss for lack of personal jurisdiction (*Playtika*, Dkt. #40; *Kater*, Dkt. #202), motions to dismiss for lack of subject matter jurisdiction (*Scientific Games*, Dkt. #59; *DoubleDown*, Dkt. #138), motions to dismiss for failure to state a claim (*Playtika*, Dkt. #40; *Scientific Games*, Dkt. #28; *High 5*, Dkt. #34; *DoubleDown*, Dkt. #289), motions to certify questions to the Washington Supreme Court (*Playtika*, Dkt. #99; *High 5*, Dkt. #99; *DoubleDown*, Dkt. #103), motions to compel arbitration (*Kater*, Dkt. #60; *Kater*, Dkt. #100; *Kater*, Dkt. #205; *Scientific Games*, Dkt. #82; *DoubleDown*, Dkt. #38; *Huuuge*, Dkt. #31), a motion to strike class claims (*DoubleDown*, Dkt. #128), interlocutory appeals of denials of motions to compel arbitration (*Scientific Games*, Dkt. #136; *DoubleDown*, Dkts. #82-83; *Huuuge*, Dkt. #47), and repeated efforts to have users click post-litigation pop-up arbitration clauses waiving their rights in these cases (*Kater*; *Scientific Games*; *DoubleDown*). Class Counsel also pursued offensive motion practice and discovery, ultimately prevailing in a slate of discovery disputes (*see, e.g.*, *Kater*, Dkt. #191; *DoubleDown*, Dkts. #366-367), obtaining data from defendants and third-party platforms Apple, Google, Facebook, and Amazon (*see, e.g.*, *Kater*, Dkt. #250; *DoubleDown*, Dkts. #366-367; *High 5*, Dkt. #129), and certifying a class (*see High 5*, Dkt. #170).

Between 2020 and 2021, Class Counsel achieved landmark settlements in four of these cases. *See Kater*, Dkt. #289 (granting final approval to $155 million settlement); *Playtika*, Dkt. #164 (granting final approval to $38 million settlement); *Scientific Games*, Dkt. #197 (granting

final approval to $24.5 million settlement); *Huuuge*, Dkt. #140 (granting final approval to $6.5 million settlement).

Building on this history, Class Counsel filed the instant action against Zynga in February 2022, alleging that Defendant's social casinos, including "Hit It Rich!," "Black Diamond Casino," "Wizard of Oz Slots," "Game of Thrones Slots," and "Willy Wonka Slots" (together, the "Applications"), constitute unlawful gambling under Washington's gambling laws. *See* Dkt. #1. Around the same time, and with a clear view of the litigation landscape outline above, the Parties agreed to mediate in May 2022 before the Honorable Layn R. Phillips (Ret.) and Niki Mendoza of Phillips ADR. *See* Dkt. #23 at 6. Notably, Zynga was represented in this action and at the mediation by the same lead counsel that represented Playtika in *Wilson v. Playtika*. *Id.* After a full-day, in-person mediation session with Judge Phillips and Ms. Mendoza, the Parties reached an agreement in principle as to an appropriate settlement amount and executed a term sheet. *Id.* For the next few weeks, the Parties continued negotiating the details of a final and binding class action settlement, exchanged drafts of a settlement agreement and supporting exhibits, met and conferred telephonically to iron out disputes, vetted and engaged a proposed settlement administrator, and began the process of meeting and conferring with the Platform Providers to design a robust notice and administration plan. *Id.* On June 27, 2022, the Parties completed execution of the Settlement Agreement now before the Court. *Id.*; Dkt. #23-1. Plaintiffs filed an unopposed motion for preliminary approval of that Agreement on the same day, Dkt. #23, and the Court granted preliminary approval on June 28, 2022. Dkt. #26.

In August 2022, Class Counsel reached a settlement in *DoubleDown* as well, for $415 million. *See DoubleDown*, Dkt. #500. The Court granted preliminary approval on November 15, 2022. *DoubleDown,* Dkt. #511. If both this settlement and the *DoubleDown* settlement are granted final approval, Class Counsel will have recovered a total of $651 million in cases before this Court on behalf of consumers losing money to social casino apps.

**Edelson PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

**IV.    Class Counsel's Leadership of Multi-District Litigation Regarding Social Casinos.**

The seven class action cases against social casinos described above undoubtedly served as catalysts for a nationwide wave of dozens of cases related to social casinos, culminating in the creation of multi-district litigation in the Northern District of California against Apple, Google, and Meta. *See In re: Apple Inc. App Store Simulated Casino-Style Games Litig.*, No. 5:21-md-2985-EJD (N.D. Cal.); *In re: Google Play Store Simulated Casino-Style Games Litig.*, No. 5:21-md-3001-EJD (N.D. Cal.); *In re: Facebook Simulated Casino-Style Games Litig.*, No. 5:21-cv-2777-EJD (N.D. Cal.). Class Counsel here have been appointed by Judge Davila as Interim Lead Counsel (Rafey S. Balabanian) and Law and Briefing Counsel (Todd Logan) in each track. *See, e.g.*, *In re Apple*, Dkt. #68 (N.D. Cal. Sept. 23, 2021); Logan Decl. ¶ 6. Class Counsel also led the MDL plaintiffs' defeat of initial motions to dismiss from each of the three platforms; specifically, Judge Davila held that the MDL plaintiffs had alleged a theory of liability—based on the "Platforms['] processing of *unlawful* transactions for *unlawful* gambling"—that was not barred by Section 230 of the Communications Decency Act. *See, e.g.*, *In re Apple*, Dkt. #106 at 33, 35 (emphasis in original). Apple, Google, and Meta are now pursuing an interlocutory appeal of Judge Davila's decision. *See, e.g.*, *In re Apple Simulated Casino-Style Games Litig.*, No. 22-80099 (9th Cir.).

**V.    Class Counsel's Litigation-Adjacent Efforts on Behalf of the Class.**

As a necessary extension of the traditional litigation work necessitated by this and the similar cases, Class Counsel has for years undertaken all manner of litigation-adjacent work for the benefit of the Class. These efforts are organized into three categories and summarized below.

*First*, Class Counsel went to great lengths to protect this and the similar litigation from collateral administrative attacks. Just two weeks after the Ninth Circuit's mandate issued in *Kater*, Defendant's industry peers dispatched their litigation attorneys to the WSGC's session in Tacoma to present a "Petition for a Declaratory Order" asking the Commission to declare that other social casino games "do not constitute gambling within the meaning of the Washington Gambling Act, RCW 9.46.0237." *Kater*, No. 15-cv-612, Dkt. #79-5 at 10. At each of the three

public hearings that followed—in July 2018 (in Tacoma), August 2018 (in Pasco), and October 2018 (in Olympia)—Class Counsel appeared before the Commission, and Class Counsel presented live argument at both the Tacoma and Pasco hearings. *See* Logan Decl. ¶ 10. Class Counsel supplemented these appearances with a formal letter to the Commission (ahead of the Tacoma hearing) and, on the Commission's request, with an eighteen-page comment for the Commission's consideration (between the Tacoma and Pasco hearings). *Id.* The WGSC ultimately declined to enter a Declaratory Order. *See Kater*, No. 15-cv-612, Dkt. #74-1. And even after the initial declaratory order proceedings, Class Counsel continued to represent the interests of the consumers in additional flare-ups before the WSGC, including in similar declaratory order proceedings initiated by The Stars Group. *See* Logan Decl. ¶ 11.

*Second*, Class Counsel has been the frontline opposition to the social casino industry's attempt to change Washington's gambling laws. Starting in early 2019, the International Social Gaming Association ("ISGA") provided legislators draft legislation that would amend Washington's gambling statutes with the effect (and specific intent) of gutting these lawsuits. *See id.* ¶ 12. Over time, these efforts gained steam, with Senators Mark Mullet and John Braun, as well as Representatives Zack Hudgins, Brandon Vick, Bill Jenkin and Brian Blake, collectively sponsoring four bills threatening to kill these cases by "clarifying" that players who lose money playing social casino games cannot recover under the RMLGA. H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020); S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020); H.B. 2041, 66th Leg., Reg Sess. (Wash. 2019); S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019). Local and national media covered these efforts and left no doubt as to what the ISGA hoped to accomplish. *See, e.g.*, Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino From Legal Trouble*, Casino.org (Jan. 29, 2020), https://bit.ly/39dKtWM.

In response, Class Counsel engaged the lobbying firm Peggen & Mara Political Consulting LLP—experts in Washington tribal and gambling laws—to help Class Counsel (i) stay on top of all administrative and legislative developments in the Washington gaming industry; (ii) understand the intricacies of Washington's specific legislative process, including

the nuances of—and procedures for—bill drafting; (iii) understand who the relevant lawmakers and stakeholders in Washington's gaming industry were, what those lawmakers and stakeholders cared about, and how Class Counsel could educate those lawmakers and stakeholders about social casinos; and (iv) work with legislative groups, task forces, and other interested parties in Washington's gaming industry, including the Washington Indian Gaming Association ("WIGA"). *See* Logan Decl. ¶ 13.

Class Counsel then used this information and expertise to amplify the Class's interests and concerns. Class Counsel drafted memos and prepared handouts for a variety of stakeholders, including State Senators and Representatives, the WIGA, the Washington Trial Attorneys' Association, the Public Interest Research Group, and other organizations dedicated to remedying problem gambling. *See id.* ¶ 14.

Class Counsel also personally met with lawmakers in the Washington Senate and House, met with officials in the Executive branch, and provided in-person testimony to the Washington Legislature. *See id.* ¶ 15. For example, in January 2019—after Class Counsel got wind that the ISGA was planning to gut Washington's gambling statutes (in what would become the failed H.B. 2041 and S.B. 5886)—Class Counsel met in-person with Representative Shelley Kloba, then-Representative (and now Senator) Derek Stanford, then-Lieutenant Governor Cyrus Habib, and several other government officials. *See id.* ¶ 16. On January 28, 2020, Class Counsel met with Senator Stanford at the State Capital—following Class Counsel's written and in-person testimony before the House Civil Rights & Judiciary Committee in (successful) opposition to H.B. 2720. *See id.* ¶ 17.

Class Counsel's efforts went beyond in-person testimony and meetings with legislative and executive officials. On March 21, 2019, Class Counsel sent formal correspondence to Senator Mark Mullet ahead of a planned work session before the Senate and Financial Institutions, Economic and Trade Committee about social casinos—in which Defendant's industry peers had been invited, but Class Counsel had not. *See id.* ¶ 18. In August 2019, Class Counsel travelled to Anacortes—on Swinomish Tribe land—to speak at a monthly WIGA

meeting, in opposition to the ISGA-backed bills. *See id.* ¶ 19. And in early 2020, Class Counsel

coordinated the submission of more than 200 letters to Washington State Representatives from

social casino players across the country and spoke with local press about the ISGA's renewed

efforts to gut these lawsuits. *See id.* ¶ 20; *see also* Melissa Santos, *'Free' casino apps prey on*

*addiction, users say, and WA lawmakers are considering a crackdown*, CROSSCUT (Feb. 7,

2020), https://bit.ly/3hfFxDl. These efforts held the line—each bill introduced since the onset of

this litigation has stalled.

To be clear, Class Counsel's efforts to protect Washington's gambling laws continue to

this day. Because of active litigation before this Court and in the Northern District of California,

Class Counsel will refrain here from publicizing the specifics of their ongoing lobbying and

other advocacy strategies outside of the confines of traditional litigation. But Class Counsel can

confirm that their ongoing advocacy incudes meetings with regulatory officials as well as

officials from the legislative and executive branches. Logan Decl. ¶ 21.

*Third*, beyond Class Counsel's work on legislative, executive, and administrative fronts,

Class Counsel also helped its clients sound the alarm on social casinos to the public at large by

helping clients share their stories with local and national media, including in the following

pieces:

- *Harpooned by Facebook*, REVEAL (Aug. 3, 2019), https://bit.ly/39NIdri (featuring radio interview with Class Counsel's client)

- Nate Halverson, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWSHOUR (Aug. 13, 2019), https://to.pbs.org/3lPRd1m (featuring television interview with Class Counsel's client)

- Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a crackdown*, CROSSCUT (Feb. 7, 2020), https://bit.ly/3qBBd6M (featuring Class Counsel's clients and Class Counsel Alexander Tievsky)

- Cyrus Farivar, *Addicted to losing: How casino-like apps have drained people of millions*, NBC NEWS (Sept. 14, 2020), https://nbcnews.to/39Lo1X1

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

- Connections: A Healthy Gambling and Gaming Podcast, *What's the Deal with Social Casinos*?, EVERGREEN COUNCIL ON PROBLEM GAMBLING (Oct. 28, 2021), https://bit.ly/3ysA9c1 (featuring Class Counsel Todd Logan)

## VI.    The Settlement Now Before the Court.

Following all of these efforts, and with the assistance of Phillips ADR, Class Counsel reached a settlement with Defendant that provides a non-reversionary cash recovery of $12 million from which every Class Member who has ever lost money playing Defendant's social casino games is entitled to recover a substantial portion of their losses back. *See* Dkt. #24-1 §§ 1.33, 1.35 (the "Agreement"). Class members with higher levels of losses are entitled to recover increasingly higher percentages of their losses, and the upper echelons of "VIP" players stand to recover more than half of their losses. *See id.* §§ 1.36, 2.1(c). The Settlement also requires Defendant to implement meaningful prospective relief, including by maintaining and honoring a self-exclusion policy akin to what one might expect to see at the Emerald Queen or the Muckleshoot casinos. *See id.* § 2.2.

### THE TERMS OF THE SETTLEMENT AGREEMENT

For the Court's convenience, the key terms of the Agreement are summarized below.

**A.    Settlement Class Definition:** The Settlement Class is defined as follows: "all individuals who, in Washington (as reasonably determined by billing address information, IP address information, or other information furnished by Platform Providers), played the Applications on or before Preliminary Approval of the Settlement."[4] *See id.* § 1.33.

**B.    Monetary Benefits:** Defendant has agreed to establish a $12,000,000.00 Settlement Fund from which Settlement Class Members who file a valid claim will be entitled to recover a cash payment—calculated after deduction of costs and administrative expenses, any fee award to Class Counsel, and any incentive payments to the Class Representatives. *See id.*

---

[4]    Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this Action and members of their families, (2) the Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, and employees, (3) persons who properly execute and file a timely request for exclusion from the class, and (4) the legal representatives, successors or assigns of any such excluded persons. *See id.* § 1.33.

§ 1.35. No portion of the Settlement Fund will revert to Defendant. *Id.* § 2.1(i). Any Settlement Class Member's checks not cashed within ninety (90) days of issuance will be returned to the fund and apportioned pro rata to participating Settlement Class Members in a second distribution or donated to the Legal Foundation of Washington, as approved by the Court. *Id.* § 2.1(h). As described in detail in the Plan of Allocation, the amount of each Settlement Class Member's payment will vary based on the Settlement Class Member's Lifetime Spending Amount (those with higher Lifetime Spending Amounts are eligible to recover a greater percentage) and overall Settlement Class Member participation levels. *See id.* §§ 1.36, 2.1(c); Exhibit E to the Agreement. Based on their experience with settlements in related cases, Class Counsel anticipate that participating Settlement Class Members in the highest category of Lifetime Spending Amounts will likely recover gross payments in excess of 60% of their Lifetime Spending Amounts, and that participating Class Members in the lowest category of Lifetime Spending Amounts will likely recover gross payments in excess of 20% of their Lifetime Spending Amounts. *See* Logan Decl. ¶ 22. Settlement Class Members will also be able to quickly and easily estimate the amount of their potential payment on the Settlement Website. *See* Agreement § 4.2(d).

   **C.    Prospective Relief:** Defendant has agreed to maintain a voluntary self-exclusion policy that will allow players to exclude themselves from further gameplay. *See id.* § 2.2(a). Defendant will also maintain a section on its website that is reasonably available from within the Applications that encourages responsible gameplay. *Id.* In addition, in response to related litigation pursued by Class Counsel, Defendant already has implemented a change to the game mechanics for the Applications such that players who run out of sufficient virtual coins to continue playing slot games in the Application they are playing are able to continue to play at least one slot game within the Application they are playing without needing to purchase additional virtual coins or wait until they would have otherwise received free additional virtual coins in the ordinary course. *Id.* § 2.2(b).

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

**D.    Release:** In exchange for the relief described above, Defendant and other entities, including the Platform Providers Facebook, Apple, Google, Amazon, Microsoft, and/or Samsung, will be released from all claims raised in cases relating to the operation of Defendant's social casino games and the sale of virtual coins in those games, including claims that the games were illegal gambling or the coins were "things of value." The full release is contained at *id.* §§ 1.28, 3.1-3.4.

**E.    Attorneys' Fees, Expenses Requests & Incentive Award Requests:** Separate from this motion, Class Counsel filed a motion for attorneys' fees, expenses, and incentive awards on October 11, 2022. *See* Dkt. #49.

## ARGUMENT

## I.    The Court Need Not Revisit Class Certification.

A threshold inquiry at final approval is whether the Class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-22 (9th Cir. 1998). Because no relevant facts have changed since the Court certified the Settlement Class, Dkt. #26 at 1, the Court need not revisit class certification here. *See, e.g.*, *Scientific Games*, Dkt. #197 (W.D. Wash. Aug. 12, 2022); *Aikens v. Panatte, LLC*, No. 2:17-cv-01519, Dkt. #54 (W.D. Wash. Feb. 5, 2019) (Lasnik, J.).

## II.    Notice Satisfied Due Process.

Prior to granting final approval to this Settlement, the Court must consider whether the Class Members received "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). "The rule does not insist on actual notice to all class members in all cases." *Mullins v Direct Digital LLC*, 795 F.3d 654, 665 (7th Cir. 2015); *see also Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012) (noting that "even in Rule 23(b)(3) class actions, due process does not require that class members actually receive notice" and collecting cases). Although what constitutes the "best notice practicable" is case-specific, the Federal Judicial Center has noted that a notice campaign

1    that reaches 70% of a class is often reasonable. Federal Judicial Center, *Judges' Class Action*

2    *Notice & Claims Process Checklist & Plain Language Guide*, at 3 (2010), *available at*

3    https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

4         The Court already provisionally approved the comprehensive Notice Plan proposed by

5    the Class Representatives and Class Counsel. Dkt. #26 ¶¶ 5-6. That plan utilized both direct and

6    publication notice to the Settlement Class. *Id.* To provide direct notice to all who were eligible to

7    submit a claim for payment from the Settlement, Class Counsel worked with Defendant and also

8    subpoenaed a variety of third parties to obtain contact information for everyone with a Lifetime

9    Spending Amount of greater than zero (*i.e.*, those who are entitled to make a claim against the

10   Settlement Fund). *See generally* Baessler Decl. This was not an easy process, requiring

11   negotiations with and issuance of subpoenas to Platform Providers. Logan Decl. ¶ 23. Apple,

12   Google, Amazon, and Meta ultimately provided Class Counsel with sufficient data to effectuate

13   the Notice Plan. *Id.* Once that data was collected, it was transmitted to JND Legal Administration

14   ("JND"), the Settlement Administrator, to compile a complete Class List. JND then sent out

15   three rounds of email notice, with the initial round reaching 92.1% of email recipients, the

16   second round reaching 90% of recipients, and the third reaching 91.6%. Baessler Decl. ¶¶ 9-12.

17        Additionally, using the information provided by Defendant and the Platform Providers,

18   JND sent postcard notice via U.S. First Class mail to all accounts identified as having a Lifetime

19   Spending Amount of $100 or more. *See id.* ¶ 13. As of November 17, 2022, at least 90.4% of

20   these postcard notices were either successfully delivered to the original mailing address on

21   record, forwarded by USPS to a forwarding address already in USPS's system, or re-mailed by

22   JND to a new address obtained through JND's own advanced address searches. *See id.* ¶ 14.

23        Direct notice was supplemented by online publication notice in the form of digital

24   advertisements targeted towards individuals most likely to be part of the Settlement Class. Given

25   the extent to which social casino players are active on social media, JND purchased sponsored

26   ads on Facebook, Instagram, and the Google Display Network. *See id.* ¶ 16. These social media

27

ads, coupled with traditional Internet banner advertisements, generated more than 10 million impressions. *See id.*

Overall, the Notice Program, including direct email and postcard notice as well as best in-class tools and technology, reached at least 90% of Settlement Class Members in Washington. *See id.* ¶ 15. That figure far exceeds the constitutional due process requirement in this Circuit. *See, e.g.*, *Askar v. Health Providers Choice, Inc.*, No. 19-CV-06125-BLF, 2021 WL 4846955, at *3 (N.D. Cal. Oct. 18, 2021) ("[N]otice plans estimated to reach a minimum of 70 percent are constitutional and comply with Rule 23.") (citation omitted).

Finally, all forms of notice accurately described the Settlement and directed the recipient to the Settlement Website, where Class Members could review the Plan of Allocation, use a calculation tool to estimate how much they are projected to recover through the Settlement, and file a claim. *See* Agreement § 4.2(d); Dkt. #23 at 7-8.

This all confirms what the Court already provisionally found: the Notice Plan here, which reached at least 90% of Settlement Class Members in Washington, *see* Baessler Decl. ¶ 15, was reasonably calculated to apprise interested Settlement Class Members of their rights under the Settlement and constituted the best practicable notice under the circumstances. The Court should therefore find that the Notice Plan complied with Due Process.

## III.    The Court Should Finally Approve the Settlement.

To approve the settlement of a class action as fair, reasonable, and adequate, Rule 23(e) requires courts to consider "whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other." These factors largely encompass those identified by the Ninth Circuit for evaluating a class

settlement. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).[5]

The Committee Notes to the recent revision of Rule 23 make clear that the newly enumerated factors were not intended to replace approval factors already used in courts around the country, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Thus, courts examine the new Rule 23 factors alongside the traditional *Churchill* factors relevant to the particular case, mindful that there is considerable overlap between the two. *See, e.g.*, *Walters v. Target Corp.*, No. 3:16-cv-1678-L-MDD, 2020 WL 6277436, at *5 (S.D. Cal. Oct. 26, 2020).

When a settlement precedes class certification, as here, approval "requires a higher standard of fairness" and "a more probing inquiry than may normally be required under Rule 23(e)." *Roes, 1-2*, 944 F.3d at 1048; *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 782 (9th Cir. 2022). In particular, "such settlement agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest." *Roes, 1-2*, 944 F.3d at 1049.

This settlement stands up to that probing inquiry, since the Rule 23(e) and *Churchill* factors decisively support final approval,[6] and there are no signs of collusion or conflicts.

A.    **Class Counsel and the Class Representatives have adequately represented the Class and support the Settlement.**

Class Counsel's representation of the Class's interests here was beyond adequate; it was extraordinary and began years before this case was filed. Class Counsel began advocating for consumers harmed by social casinos eight years ago, and has filed seven proposed class actions

---

[5]    The *Churchill* factors are: "(1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019).

[6]    There is no governmental participant here, so that *Churchill* factor is neutral. Further, to date, there are no agreements that must be identified under Rule 23(e)(3), nor do counsel anticipate reaching any such agreements.

in this District against social casino companies. After achieving the landmark Ninth Circuit ruling in *Kater*, Class Counsel has had to defend Washington's gambling laws from repeated attacks both in the WSGC and the Washington State Legislature. All the while, Class Counsel successfully defended against various social casino defendants' efforts to knock the cases out of federal court or otherwise dismiss the cases. *See* Background, *supra.* Time and time again, Class Counsel held the line, moved the cases closer to class certification and trial, and achieved the four social casino class settlements previously approved by this Court. These efforts all served the interests of the Class in this case, leading to an early settlement that matches the relief secured in the other, more extensively litigated cases. All of these efforts demonstrate that Class Counsel provided more than adequate service to the Class.

Class Representatives Ferrando and Marzano likewise adequately represented the Class. Both made substantial contributions to the Class, including stepping forward to serve as class representatives and named Plaintiffs, staying in regular communication with Class Counsel, timely responding to requests for information, and closely reviewing the Settlement Agreement before approving it. *See* Dkt. #52 (Declaration of Tonda Ferrando) ¶¶ 4-5; Dkt. #53 (Declaration of Dex Marzano) ¶¶ 4-5. Their services were more than adequate.

In addition, while the Court should not apply any presumption of fairness based on counsel's views, the "experience and views of counsel" remain factors that the Court may consider. *Roes, 1-2*, 944 F.3d 1035, 1048; *see also Evans v. Zions Bancorporation, N.A.*, No. 2:17-CV-01123 WBS DB, 2022 WL 16815301, at *3 (E.D. Cal. Nov. 8, 2022). Class Counsel here are the only lawyers with significant experience prosecuting these types of social casino claims, and it is their considered judgment that this Settlement represents an outstanding result for the Settlement Class. *See Evans*, 2022 WL 16815301, at *3-4 (applying "heightened scrutiny" and finding that "the sophistication and experience of plaintiff's counsel" weighed in favor of final approval).

**B.    The Settlement was negotiated at arm's length and shows no signs of collusion.**

The Settlement here was negotiated at arm's length and was the product of non-collusive negotiations—as the Court found at preliminary approval. *See* Dkt. #26 at 1. The Settlement was reached after weeks of arm's-length negotiations, during which time the Parties exchanged substantial briefing on the core legal issues and were in regular communication with the Phillips ADR team, and after a full-day, in-person mediation session with both Judge Layn Phillips (ret.) and Ms. Niki Mendoza. *See Jackson v. King Cnty.*, No. 21-CV-00995-LK-BAT, 2022 WL 168524, at *2-3 (W.D. Wash. Jan. 18, 2022) (applying "heightened scrutiny" to pre-certification settlement and finding that mediation before "an experienced third-party neutral . . . who had mediated negotiations during the precursor [] litigation" supported a finding of arm's-length negotiations).

Moreover, this Settlement contains none of the red flags the Ninth Circuit has identified as indicative of possible collusion: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded," (2) "when the parties negotiate a 'clear sailing' arrangement," and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *In re Bluetooth*, 654 F.3d at 947 (quotations omitted). Class Counsel's fees will be determined separately, but as explained in the motion for attorneys' fees and expenses, they seek a percentage recovery that is consistent with Washington law and Ninth Circuit precedents, reflects their work here, and is proportionate. *See generally* Dkt. #49. Further, the Settlement does not contain a "clear sailing" agreement; Defendant is free to object to Class Counsel's fee petition if it so desires. *See* Agreement § 8.1. And there is no reversion here. All Settlement funds will go to Class Members, less Class Counsel's fees and any administrative costs. *See id.* §§ 1.35, 2.1(i).

While the Parties reached a settlement early in this particular action, that is a direct result of Class Counsel's years of adversarial social casino litigation before this Court, including

EDELSON PC
350 N LaSalle Street, 14th floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

adversarial social casino litigation with Defendant's counsel. *See* Dkt. #23 at 1 (noting that Zynga's lead counsel here also served as Playtika's lead counsel in *Wilson v. Playtika*, No. 18-cv-5277). Indeed, the results achieved in this settlement equal those achieved in the prior, more-heavily-litigated social casino settlements such as *Playtika* and *Scientific Games*. *See id.* Even under heightened scrutiny, therefore, this settlement raises no concerns of collusion, which supports final approval. *See* Dkt. #51 (Rubenstein Decl.) ¶ 26 ("This settlement, although achieved efficiently, raises no concerns that it might be collusive.").

### C.      The amount offered in the Settlement is adequate, given the strength of Plaintiffs' case and the risks inherent in further litigation.

Even before the revised Rule 23 highlighted that the Court should consider the amount offered in settlement, courts recognized that the size of any settlement, compared to the likelihood of full recovery, "is generally considered the most important" factor in evaluating a settlement. *See Bayat v. Bank of the West*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015). Here, an evaluation of the risks present in this litigation, combined with an assessment of the scope of relief, shows that the Settlement easily qualifies as fair, reasonable, and adequate.

#### i.      The Settlement Class would have faced significant delay before it could have recovered anything on the merits.

To be frank, Class Counsel is confident in the merits of this case. The key legal questions, particularly under the RMLGA, are straightforward, and in Class Counsel's view have been conclusively answered by the Ninth Circuit's decision in the appeal in the *Kater* matter. Nevertheless, the case presented some legal risks. For instance, Defendant could have filed a motion contending that California law (and not Washington law) governs the Class's claims due to a choice-of-law provision in Defendant's Terms of Service. Defendant also could have raised various arguments similar to those raised by other social casino defendants, such as the contention that the regular provision of free virtual coins within their gambling games meant that the coins themselves were not "things of value." *See, e.g.*, *Scientific Games*, Dkt. #28 (W.D.

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

Wash. July 2, 2018) (motion to dismiss RMLGA claim); *DoubleDown*, Dkt. #103 (W.D. Wash. June 17, 2020) (seeking to certify issue to the Washington Supreme Court). Plaintiffs, of course, disagree with this argument, and this Court has denied other defendants' attempts to dismiss RMGLA claims. *See, e.g.*, *Scientific* Games, Dkt. #38 (denying motion to dismiss); *DoubleDown*, Dkts. #127, #156 (denying motion to certify questions and motion for reconsideration). But it is also true that the opinion in *Kater* specifically notes that the court there did not reach a conclusion on the defendants' specific arguments about the regular provision of free chips. *See* 886 F.3d at 787.

Moreover, as Plaintiffs explained at preliminary approval, the principal risk here was legislative, *i.e.*, the chance that the ISGA's lobbying efforts may eventually lead to a retroactive change in Washington gambling law. *See* Logan Decl. ¶ 24. Class Counsel have thus far fended off the ISGA's lobbying efforts, but the ISGA and its members—many of them billion-dollar gambling corporations—are formidable opponents. If this case does not settle now, then during each legislative cycle, the Class will be at risk of having its claims eviscerated in the name of "remov[ing] . . . economic uncertainty" by "clarifying" that proposed Class Members cannot recover under the RMLGA. *See, e.g.*, H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020).

The legislative risk is particularly acute here because it is practically inevitable that this case would take years to reach judgment. If the other social casino cases in this District are any guide, then the Parties here would likely have engaged in significant motion practice on the pleadings, on discovery issues, on class certification, and, perhaps, summary judgment and trial if the case had not settled. Appeals of arbitration, class certification, or trial verdicts also could have significantly lengthened the proceedings. Courts have regularly recognized that the prospect of significant delay while a case works its way to judgment is reason to favor immediate settlement. After all, one dollar today is worth significantly more than one dollar three years from now. *See Rodriguez*, 563 F.3d at 966 ("Inevitable appeals would likely prolong the litigation, and any recovery by class members, for years. This factor, too, favors the settlement."); *Ikuseghan v. Multicare Health Sys.*, No. 3:14-cv-05539 BHS, 2016 WL 3976569,

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

at *4 (W.D. Wash. July 25, 2016) ("[T]he outcome of trial and any appeals are inherently uncertain and involve significant delay. The Settlement avoids these challenges[.]"). But delay would be especially problematic here. The longer the case survives, the more opportunities Defendant and its industry allies would have to effect retroactive change to the law.

ii. **Given the risks involved with further litigation, the amount offered in Settlement is outstanding.**

The most significant aspect of the agreement secured by this Settlement is the $12 million non-reversionary common fund, which will be used to help Settlement Class Members recoup their losses. That is an "astounding" recovery. Dkt. #51 (Rubenstein Decl.) ¶ 2. Based on the Settlement Administrator's final tally, the Settlement Fund equals approximately 21% of the Settlement Class's approximately $57 million in total spending. Baessler Decl. ¶ 7. That puts this settlement right in line with the relief secured (and finally approved) in *Scientific Games* and *Playtika.* It is also a significant enough sum that Class Members with the largest Lifetime Spending Amounts stand to recover more than 60% of their losses, and that no participating Class Members is likely to recover less than 20% of their losses. *See* Logan Decl. ¶ 23; *cf. Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982) ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair").

Other than the other social casino settlements in this District, it is difficult to find any other true peers to reasonably measure against. The closest factual comparator is probably *In Re: Daily Fantasy Sports Litigation*, where consumers alleged that betting companies DraftKings and FanDuel purveyed online contests that constituted "illegal gambling" under a variety of state and federal laws, unfairly causing "millions of users" to lose "hundreds of millions of dollars." No. 16-md-2677-GAO, Dkt. #227 (Consolidated Complaint) ¶¶ 491, 793 (D. Mass. June 30, 2016). The settlements there were paltry: DraftKings users, for example, were primarily compensated in "DK Dollars" (i.e., in-game currency that cannot be withdrawn for cash) and the

1   cash component of the settlement totaled $720,000. *See In Re: Daily Fantasy Sports Litig.*, Dkt.

2   #459 at 6.

3       Perhaps a better comparator is *Zanca v. Epic Games*, where the class alleged that so-

4   called "loot boxes" in games like *Fortnite* "capitalize on and encourage addictive behavior, akin

5   to gambling" and unfairly coaxed children to spend "significant amounts of money"—some

6   "thousands of dollars"—on in-game currency. No. 21-CVS-534, Complaint ¶¶ 25, 36, 131

7   (Wake Cnty. Sup. Ct. Jan. 12, 2021), https://bit.ly/3PzpMsN. There, the settlement appears to

8   have established no common fund at all, instead giving class members 1,000 "credits" to spend

9   on loot boxes in addition to either "up to $50" in cash or another 13,000 "credits." *See* Epic

10  Games Settlement FAQs, Epiq Systems, Inc. (May 11, 2022), https://bit.ly/3MC2LUb.

11  Similarly, in *In re Apple In-App Purchase Litigation*, the class alleged that certain apps offered

12  within Apple's App Store were "highly addictive, designed deliberately so, and tend to compel

13  children playing them to purchase large quantities" of in-game currency, "amounting to as much

14  as $100 *per purchase* or more." No. 5:11-cv-01758-EJD, 2013 WL 1856713, at *1 (N.D. Cal.

15  May 2, 2013) (emphasis added). But there, the settlement likewise established no common fund,

16  the default recovery for participating class members was five dollars (yes, $5), and with adequate

17  proof some claiming class members could claim refunds for a single 45-day period of purchases.

18  *Id.* at *5. Ultimately, there is just no comparison between these other settlements and the series

19  of social casino settlements before the Court, including this one.

20      Beyond the cash recovery, the Settlement provides for substantial non-monetary benefits.

21  As part of the Settlement, Defendant agreed to meaningful prospective relief, including

22  maintaining and honoring a voluntary self-exclusion policy, and maintaining a section on its

23  website that is reasonably available from within the Applications and encourages responsible

24  gameplay. Agreement § 2.2(a). Defendant also implemented a change to the game mechanics for

25  the Applications after and as a result of the prior social casino litigation pursued by Class

26  Counsel; specifically, the change ensures that players who run out of virtual coins are able to

27  continue to play at least one slot game within the Application they are playing. *Id.* § 2.2(b).

1    These in-game changes are a monumental achievement for the Settlement Class. They represent

2    the first steps towards much-needed self-regulation within the social casino industry, and given

3    Defendant's prominence in the social casino industry, other industry players have followed and

4    will continue to follow suit.

5        In sum, the amount offered in the Settlement, when compared with the risks and expense

6    of further litigation, strongly supports final approval.

7        **D.    The Settlement treats Settlement Class Members equitably.**

8        Revised Rule 23 further asks courts to assess whether the proposed settlement "treats

9    class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The Rule's revised

10   text makes clear that *equal* treatment is not required, but fair treatment is instead the goal. The

11   Settlement here achieves that goal.

12       As Class Counsel explained at preliminary approval, and as hashed out in detail in the

13   Plan of Allocation, a given Settlement Class Member's total recovery will depend on the extent

14   of their losses (*i.e.*, those with greater losses will recover a higher proportion of their losses). *See*

15   Agreement § 1.36, 2.1(c), (d). The Plan of Allocation therefore distributes settlement funds

16   according to those who have suffered the greatest harm.

17       Allocating settlement funds in this way achieves an equitable result. Settlement Class

18   Members with tens or hundreds of thousands of dollars in losses have frequently suffered serious

19   collateral harms, such as alienation from family or friends or the accrual of huge interest-bearing

20   debts, that were not suffered by those who may have purchased $10 or $20 worth of coins. And

21   even though all Settlement Class Members have equally strong RMLGA claims, Settlement

22   Class Members with particularly significant losses may have stronger Consumer Protection Act

23   claims—including stronger potential claims for treble damages—to release here. So while the

24   Class stands largely on equal footing, a clear-eyed assessment of the risks that lay ahead

25   demonstrates that certain claims may be stronger than others, something appropriately reflected

26   in the Plan of Allocation. *See In re Equity Funding Corp. of Am. Securities Litig.*, 603 F.2d 1353,

27   1365 (9th Cir. 1979) (concluding that the district court's approval of certain offsets "in [a] Plan

of Allocation was a component of its duty to insure the equitable distribution of the settlement proceeds"); 2 McLaughlin on Class Actions § 6.23 (17th ed. 2020) ("Allocation formulas, including certain discounts for certain types of claims within a class, may properly take into consideration the comparative strengths and values of different categories of the settled and released claims.").

Likewise, the provision of incentive awards for the Class Representatives is consistent with the equitable treatment of Class Members. Tonda Ferrando and Dex Marzano seek modest awards of $5,000 each, which reflect their service to the Class. As stated above, both made substantial contributions to the Class, including stepping forward to serve as class representatives and named Plaintiffs, staying in regular communication with Class Counsel, timely responding to requests for information, and closely reviewing the Settlement Agreement before approving it. *See* Dkt. #52 (Declaration of Tonda Ferrando) ¶¶ 4-5; Dkt. #53 (Declaration of Dex Marzano) ¶¶ 4-5. In addition, both made substantial personal sacrifices for the benefit of the Class, including the fact that anyone who Googles their names now sees pages of websites talking about their involvement in these lawsuits. *See* Dkt. #52 ¶ 3; Dkt. #53 ¶ 3. The risk of reputational injury was higher here than in many other class action suits, given the subject matter of the lawsuit. As set forth in the previously filed motion for incentive awards, awards of this size are in line with other awards given to class representatives and fairly reflect Ferrando's and Marzano's service to the Class. Given that their efforts were key to ensuring that the Class recovered anything, the modest proposed incentive awards are fully consistent with equity.

In sum, the Settlement treats all Class Members equitably relative to each other, which supports final approval.

### E.    Class Counsel was able to reach an informed judgment about the benefits of settling and the quality of the Settlement.

Next, the Parties "had enough information to make an informed decision about the strength of their cases and the wisdom of settlement." *Rinky Dink Inc. v. World Bus. Lenders, LLC*, No. C14-0268-JCC, 2016 WL 4052588, at *5 (W.D. Wash. Feb. 3, 2016).

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

While the Parties reached a settlement early in this particular action, that is a direct result of Class Counsel's years of social casino litigation before this Court and years of litigation with Defendant's counsel. *See* Dkt. #23 at 1 (noting that Zynga's lead counsel here also served as Playtika's lead counsel in *Wilson v. Playtika*, No. 18-cv-5277). Consequently, both Parties began this case with an in-depth understanding of the strengths and weaknesses of the Parties' claims and defenses as well as the social casino litigation landscape. *See* Logan Decl. ¶ 25.

Indeed, in the weeks before the mediation, Defendant provided Plaintiffs with data regarding virtual coin purchases; the Parties exchanged substantial briefing on the core facts, legal issues, and litigation risks; and the Parties supplemented that briefing with extensive written and telephonic correspondence, mediated and shuttled by the Phillips ADR team, clarifying each other's positions. It was only after these weeks-long efforts, and with the skilled assistance of the Phillips ADR team, that the Parties were able to hash out a settlement. *See* Logan Decl. ¶ 26. By then, and in light of all counsel's experience in prior social casino litigation, the Parties were fully informed on all pertinent issues and capable of assessing the benefits of the settlement now before the Court. *See id.*; *Ikuseghan*, 2016 WL 3976569, at *3 (approving settlement reached "between experienced attorneys who are familiar . . . with the legal and factual issues of this case in particular"). This factor, too, thus supports final approval.

## F.   The reaction of the Settlement Class has been favorable.

Finally, current claim data indicates that the Class has responded favorably to the Settlement, warranting final approval. Thus far, the Settlement Administrator has received more than 7,686 claims that total at least $14.45 million, reflecting an Adjusted Claims Rate of at least 25.25%. Baessler Decl. ¶ 23. By contrast, zero Class Members objected to the settlement, and only one asked to be excluded from the settlement. *Id.* ¶¶ 25, 27. These numbers speak volumes regarding the fairness and adequacy of the Settlement. "When few class members object, a court may appropriately infer that a class action settlement is fair, adequate, and reasonable." *Schneider v. Wilcox Farms, Inc.*, No. 07-CV-01160-JLR, 2009 WL 10726662, at *3 (W.D. Wash. Jan. 12, 2009); *accord Pelletz v. Weyerhouser Corp.*, 255 F.R.D. 537, 543-44 (W.D.

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

Wash. 2009) (lauding "positive response" of Settlement Class of 110,000 to 140,000 members where 19 excluded themselves from the settlement, and 3 objected); *see also Churchill Vill.*, 361 F.3d at 577 (affirming approval of class action settlement where 45 of 90,000 class members objected). Given the participation rates here, and absence at present of any objections to the Settlement, the Court should find that the reaction of the Settlement Class favors final approval.

## CONCLUSION

The Court should grant final approval and enter the attached [Proposed] Order.

Respectfully submitted,

Dated: November 18, 2022

**TONDA FERRANDO and DEX MARZANO**, individually and on behalf of all others similarly situated,

By:  /s/ Todd Logan

Rafey S. Balabanian*
rbalabanian@edelson.com
Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300 / Fax: 415.373.9435

By:  /s/ Alexander G. Tievsky

Jay Edelson*
jedelson@edelson.com
Alexander G. Tievsky, WSBA #57125
atievsky@edelson.com
Amy B. Hausmann*
abhausmann@edelson.com
EDELSON PC
350 N LaSalle Street, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370 / Fax: 312.589.6378

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

By: /s/ Cecily C. Jordan

Cecily C. Jordan, WSBA #50061
cjordan@tousley.com
TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Tel: 206.682.5600

*Plaintiffs' Attorneys and Class Counsel*

*Admitted pro hac vice

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378